UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BRYAN W. CLARK, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  07 C 6809 |
| | ) | |
| v. | ) | |
| | ) | Judge Lefkow |
| 400 N. ORLEANS, LLC; | ) | |
| DEUTSCH, LEVY & ENGEL, CHARTERED; | ) | Magistrate Judge Denlow |
| and LEO G. AUBEL; | ) | |
| | ) | JURY DEMANDED |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff Bryan W. Clark asserts this first amended complaint against Defendants 400 N. Orleans, LLC; Deutsch, Levy & Engel, Chartered; and Leo G. Aubel as follows:

### Parties

1.  Plaintiff Bryan W. Clark ("Clark") resides in Tampa, Florida and is a citizen of Florida.

2.  Defendant 400 N. Orleans, LLC ("Orleans") is an Illinois limited liability company with a principal place of business in Northbrook, Illinois.

3.  Defendant Deutsch, Levy & Engel, Chartered ("DLE") is an Illinois corporation with a principal place of business in Chicago, Illinois.

4.  Defendant Leo G. Aubel ("Aubel") resides in Chicago, Illinois and is a citizen of Illinois.

**Jurisdiction and Venue**

5. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between the parties. Clark is a citizen of Florida, while Orleans, DLE, and Aubel are citizens of Illinois.

6. In addition, the matter in controversy exceeds the value of $75,000, exclusive of interest and costs. As explained below, the disputes in this action involve a contract for the purchase of property for the amount of $900,000, and potential liability equal to or in excess of that amount.

7. Orleans, DLE, and Aubel are subject to the exercise of personal jurisdiction – both general and specific – in this district.

8. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(1) & (2) because Orleans, DLE, and Aubel all reside in this district, and because a substantial part of the events and omissions giving rise to Clark's claims occurred in this district.

**The Real Estate Purchase Agreement**

9. In 2007, Clark planned to move from Tampa, Florida to Chicago, Illinois.

10. He retained Elizabeth Ballis, a real estate broker licensed in Illinois ("Ballis"), to help him look for a new home.

11. At the time, Orleans was the owner and developer of a condominium project located at 400 N. Orleans, Chicago, Illinois ("the Building").

12. In connection with the sale of condominium units at the Building, Orleans retained Lisa Baehm, a real estate broker licensed in Illinois ("Baehm").

13. At all relevant times, Baehm was acting as the agent of Orleans.

14.     On July 4, 2007, Bryan signed a contract to purchase Unit D in the Building ("Unit"), which contract was entitled Condominium Purchase Agreement ("the Agreement").

15.     Orleans signed the Agreement on July 5, 2007.

16.     An authentic copy of the Agreement as originally executed (that is, without the Attorney Modifications Rider) is attached hereto as Exhibit A.

17.     In the Agreement, Clark agreed to pay $900,000 as the purchase price of the Unit. (Agreement, Ex. A, ¶ 3(a).)

18.     The Agreement, with regard to the date of the closing on the Unit, states, in pertinent part:

> The closing date shall be on such date following substantial completion of the Unit . . . (the "Closing Date").  It is estimated by 9/28/2007, subject to delays occasioned be [sic] strikes, labor or material shortages, casualties, inclement weather conditions, acts of God and other causes beyond the reasonable control of the Seller.

(Agreement, Ex. A, ¶ 8.)

19.     The Agreement contained an attorney's modification clause, which made the Agreement conditional on the subsequent approval of the parties' legal counsel during an attorney approval period of ten business days.

20.     Prior to executing the Agreement, Clark retained Aubel and his law firm, DLE, to represented him in connection with the purchase of the Unit.

21.     Aubel is an attorney licensed to practice law in Illinois.  He has been an attorney since 1986. According to DLE's website, Aubel is a Principal of DLE whose practice, among other areas, "emphasizes real estate transactions."

22.     At all relevant times, Aubel was acting as the agent of DLE.

23. Marc A. Cervantes, a Chicago attorney ("Cervantes"), represented Orleans in connection with the purchase of the Unit.

### The Attorney Modifications Rider

24. During the attorney approval period in early July 2007, Clark had a series of telephone conference calls with Aubel and Ballis. In these calls, Clark, among other things, expressed his concern that Orleans would not have the Unit ready to close by the estimated closing date in the Agreement of 9/28/07; that he did not want to move to Chicago during the winter months, and thus did not want the closing delayed until winter; that he did not want Orleans to have an open-ended time frame for completing work on the Unit; that he was willing to give Orleans an additional month beyond the estimated closing date to substantially complete and close on the Unit; and that the attorney modifications to the Agreement had to contain a "drop-dead date" requiring Orleans to substantially complete and close on the Unit by October 31, 2007.

25. Aubel told Clark and Ballis that he would draft an attorney modifications rider that contained a "drop-dead date" of October 31, 2007.

26. During the attorney approval period in early July 2007, Ballis had a series of telephone conference calls with Baehm. In these calls, Ballis told Baehm, among other things, that Clark insisted that Orleans be ready to close on the Unit no later than a month beyond the estimated closing date in the Agreement, and that the attorney modifications to the Agreement would contain a "drop-dead date" requiring Orleans to substantially complete and close on the Unit by October 31, 2007.

27. Aubel drafted a document for entitled Attorney Modifications Rider ("the Rider"). The Rider modified and became a part of the Agreement.

4

28. Aubel signed the Rider on behalf of Clark.

29. On July 20, 2007, Cervantes signed the Agreement on behalf of Orleans.

30. An authentic copy of the Rider, as executed, is attached hereto as Exhibit B.

31. Paragraph 4 of the Rider states, in part, "in no event shall the Closing Date be any later than October 31, 2008 . . . ."

32. Aubel's insertion of the date "October 31, 2008" in Paragraph 4 of the Rider was a drafting mistake that did not express his or Clark's true intent of giving Orleans an additional month beyond the estimated closing date in the Agreement and establishing a "drop-dead date" of October 31, 2007.

33. Prior to executing the Rider, Orleans was aware of Clark's true intent of giving Orleans an additional month beyond the estimated closing date in the Agreement and establishing a "drop-dead date" of October 31, 2007. Orleans, though its agent Baehm, knew that Aubel's use of the 2008 date in the Rider was a drafting mistake that did not reflect Clark's true intent. Nevertheless, Orleans and Baehm decided not to alert either Aubel or Clark of Aubel's drafting mistake, and to sign the Rider that contained Aubel's drafting mistake.

34. On October 19, 2007, Aubel sent a fax to Cervantes and others. Aubel stated, "As you know, the outside Closing Date pursuant to Paragraph 4 of the Attorney Modifications Rider is October 31, 2007." Aubel also said that the Unit likely would not be ready by October 31, 2007. Aubel asked Orleans to enter into a termination of the Agreement and refund Clark all the money he had paid to Orleans.

35. An authentic copy of Aubel's October 19, 2007 correspondence is attached hereto as Exhibit C.

36. On October 19, 2007, Cervantes responded in writing. Cervantes stated the Rider actually contains a "drop-dead date" of October 31, 2008. He "respectfully declined" Aubel's request to terminate the Agreement.

37. An authentic copy of Cervantes' October 19, 2007 correspondence is attached hereto as Exhibit D.

38. On October 20, 2007, Aubel called and left a voicemail message for Ballis' assistant, Shannon Toborg ("Toborg"). In this voicemail, Aubel apologized for making a "big mistake," and said that he was "embarrassed" to have to call Toborg, and to have to call Clark, in order to explain that the Rider mistakenly contained a 2008 date.

39. Later that day, Toborg spoke with Aubel. Aubel told Toborg that he was looking into the drafting of the Rider, and that he thought that there might have been a conspiracy in which the other attorney (that is, Cervantes) had changed the date in the Rider.

40. On October 29, 2007, Aubel wrote Cervantes. Aubel stated that Cervantes had told him over the telephone that the Seller could not close on the Condo until January 2008. Aubel stated, "we had negotiated a 'drop-dead date' of October 31, 2007. Unfortunately, I didn't realize that in one of the versions of the Attorney Modification Rider, that date was somehow changed to October 31, 2008."

41. An authentic copy of Aubel's October 29, 2007 correspondence is attached hereto as Exhibit E.

42. On November 5, 2007, Cervantes responded to Aubel in writing. Cervantes stated that "your office had drafted the Attorney Modifications Rider inserting the October 31, 2008, language during the Attorney Modification Period. If you are insinuating that someone at my office had made any changes to that language, you are mistaken." Cervantes stated, "Therefore,

pursuant to the Rider your office drafted and my client agreed to, we have until October 31, 2008, to close the transaction."

43.　An authentic copy of Cervantes' November 5, 2007 correspondence is attached hereto as Exhibit F.

44.　On November 7, 2007, Aubel wrote a letter to Clark. Aubel stated, "I sought permission to file a lawsuit on your behalf against the developer of the referenced property on a no-fee basis. That permission was not granted."

45.　An authentic copy of Aubel's November 7, 2007 correspondence is attached hereto as Exhibit G.

### The Escrow Payment And Upgrades Payments

46.　Around the time Clark executed the Agreement, and pursuant to Paragraph 3(b) of the Agreement, Clark provided Orleans with $1,000 in earnest money.

47.　Following the execution of the Rider, and pursuant to Paragraph 3(b) of the Agreement, Clark provided Orleans with an additional $44,000 in earnest money, bringing the total earnest money Clark paid to $45,000 ("the Earnest Money Payments").

48.　In addition, following the execution of the Rider, Clark provided Orleans with payments totaling $10,403.56 for upgrades to the Unit ("the Upgrade Payments").

49.　Orleans refuses to return the Earnest Money Payments and the Upgrade Payments to Clark.

### Count I – Reformation Of Contract (Against Orleans)

50.　Clark realleges Paragraphs 1 through 49.

51.     Under Illinois law, a plaintiff is entitled to reformation of a written contract when a provision not agreed upon by the contracting parties is inserted by a mistake of one party, and the other party knows of the mistake but fails to inform the first party.

52.     In this case, Aubel mistakenly inserted the "October 31, 2008" date instead of the intended "October 31, 2007" date in the Rider to the Agreement; Orleans knew about Aubel's drafting mistake and Clark and Aubel's intention to use the "October 31, 2007" date in the Rider; but Orleans decided not to inform Aubel, Clark, Ballis, Toborg, or anyone else associated with those persons of this drafting mistake.

53.     Without reformation of the Contract, Clark faces potential liability for breach of contract that could exceed $900,000 due to an attorney's drafting mistake, which would be manifestly unjust to Clark.

54.     Accordingly, Clark is entitled to have the Agreement reformed by judicial order so that the date in Paragraph 4 of the Rider states "October 31, 2007."

WHEREFORE, Clark respectfully asks this Court to (a) enter judgment in favor of Clark and against Orleans on Count I; (b) enter an order reforming the Agreement so that Paragraph 4 of the Rider states the date of "October 31, 2007" instead of "October 31, 2008"; (c) award Clark his costs of suit; and (d) award Clark any other relief that the Court deems just.

### Count II – Breach Of Contract  (Against Orleans)

55.     Clark realleges Paragraphs 1 through 54.

56.     By failing to substantially complete and be able to close on the Unit by October 31, 2007, and by failing to notify Clark of a closing by that date in writing in accordance with the

Agreement, Orleans violated Paragraph 4 of the Rider (as reformed pursuant to Count I) and thereby breached the Agreement.

57. This breach of contract is material and renders the Agreement void and unenforceable.

58. Clark complied with all of his obligations under the Agreement.

59. By virtue of its breach of the Agreement, Orleans is obligated to pay compensatory damages to Clark, which include but are not limited to the return of the Escrow Payments and the Upgrade Payments, with interest.

WHEREFORE, Clark respectfully asks this Court to (a) enter judgment in favor of Clark and against Orleans on Count II; (b) enter an order declaring that Orleans breached the Agreement, as reformed, and that the Agreement is void and unenforceable; (c) award Clark his compensatory damages against Orleans in an amount to be determined at trial; (d) award Clark his costs of suit; and (e) award Clark any other relief that the Court deems just.

## Count III – Legal Malpractice (Against DLE and Aubel)

60. Clark realleges Paragraphs 1 through 49.

61. In this Count III, Clark does not seek any relief that duplicates any relief he might obtain from Orleans through Counts I and II of this first amended complaint.

62. As counsel for Clark, Aubel and DLE owed a duty to Clark to possess and apply the knowledge and use the skill and care ordinarily used by a reasonably well-qualified attorney and law firm in Illinois involved in real estate transactions.

63. This standard of care required Aubel and DLE to draft an attorney modifications rider to the Agreement that accurately reflected Clark's intent to modify the Agreement by inserting the correct and intended "drop-dead date" of "October 31, 2007" into the Agreement.

64. A lawyer and his or her law firm, acting in accordance with this standard of care, would have drafted and signed on Clark's behalf an attorney modifications rider containing the correct "October 31, 2007" date.

65. Aubel and DLE's insertion of the mistaken "October 31, 2008" date into the Rider, and Aubel and DLE's failure to find that drafting mistake before or at the time that Aubel signed the Rider on Clark's behalf, breached the duty of care that Aubel and DLE owed to Clark and thereby constituted legal malpractice.

66. Given that Aubel drafted and signed the Rider on Clark's behalf, it was the responsibility of Aubel and DLE, and not the responsibility of Clark or Ballis, to detect and correct this drafting mistake before Cervantes signed the Rider.

67. Aubel and DLE's commission of legal malpractice already has caused Clark to suffer damages. But for Aubel and DLE's insertion of the mistaken "October 31, 2008" date into the Rider, instead of the correct "October 31, 2007" date, Clark (a) would have received the Earnest Money Payments back from Orleans; (b) would have received the Upgrade Payments back from Orleans; and (c) would not have been required to expend attorneys' fees and expenses in suing Orleans for reformation of the Agreement and breach of the Agreement; and (d) would not have been required to expend attorneys' fees and expenses in defending Clark against Orleans' expected counterclaim against Clark for breach of the Agreement.

68.     Furthermore, as a sole and direct result of Aubel and DLE's commission of legal malpractice, Clark faces potential liability to Orleans for breach of the Agreement that could exceed $900,000.

69.     To protect Clark against this massive potential liability to Orleans, Clark is entitled to the entry of a declaratory judgment stating that Aubel and DLE committed legal malpractice as alleged in this first amended complaint and thus are jointly and severally liable for any liability that Clark might owe Orleans for breach of the Agreement.

70.     Without this declaratory relief, Clark might have to wait several years to obtain a judgment against him that could bankrupt him.  Furthermore, because Clark already has suffered real damages now as result of the legal malpractice of Aubel and DLE, a Court might decide that the statute of limitations for Clark's legal malpractice claim is running now.  Thus, any postponement of the adjudication of this request for declaratory relief would cause an extreme hardship and injustice to Clark.

WHEREFORE, Clark respectfully asks this Court to (a) enter judgment in favor of Clark and against DLE and Aubel, jointly and severally, on Count III; (b) award Clark his compensatory damages against Aubel and DLE, jointly and severally, in an amount to be determined at trial (and not to duplicate any relief that Clark may obtain through Counts I and II); (c) enter an order declaring that Aubel and DLE committed legal malpractice as alleged in this first amended complaint and thus are jointly and severally liable for any liability that Clark might owe Orleans for breach of the Agreement; (d) award Clark his costs of suit; and (e) award Clark any other relief that the Court deems just.

CLARK DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.

          Respectfully submitted,

          BRYAN W. CLARK

          By   s/Jay R. Hoffman
              His Attorney

Jay R. Hoffman  (6193213)
Suite 1800
303 West Madison Street
Chicago, IL 60606
(312) 899-0899
Fax:  (312) 899-8201
jay@hoffmanlegal.com

12