# EXHIBIT  A

## CONDOMINIUM PURCHASE AGREEMENT

### 400 ORLEANS CONDOMINIUM

### 400 N. ORLEANS

### CHICAGO, ILLINOIS

NAME OF PURCHASER: Bryan W Clark

HOME ADDRESS:___4222W Sevilla St_____HOME PHONE:__813-832-3019_

CITY AND STATE:____Tampa, FL_____OFFICE PHONE:_813-220-4545_

**SELLER:     400 N. ORLEANS, LLC**

1.   OWNERSHIP: Seller agrees to sell and Purchaser agrees to purchase, pursuant to the terms and conditions hereinafter set forth, the premises consisting of the exclusive ownership of Unit No.__D_(the "Unit") together with its undivided percentage interest as a tenant in common in the Common Elements of the Property known as 400 N. Orleans, Chicago, Illinois.

2.   DESCRIPTION OF REAL ESTATE: The Parcel on which all of the condominium units at the 400 Orleans Condominium (the "Condominium") is situated is legally described in Exhibit "A" attached hereto and made a part hereof.

3.   PRICE AND TERMS:

   (a)   The Purchase Price:          S_900,000 *Including parking
                                       space as identified during walk-thru

   (b)   The Earnest Money:

      (i)    $1,000.00       Deposited herewith

      (ii)   $__5%_____    within ~~thirty (30) days~~ 2 business days after attorney
                                                                      approval/inspection

      (iii)  $___NA_____   within ten (10) days of project being dryed in.

            $___45,000___   TOTAL EARNEST MONEY DEPOSIT

BWC

(e)   This Contract is contingent upon the ability of Purchaser to secure within fifteen (15)
      days of acceptance hereof by the Seller, a mortgage commitment for $_____,
      with the interest rate (or the initial interest rate) not to exceed the prevailing rate being
      charged by lenders in the Chicagoland area, to be amortized over _____ years, with the
      service charge not to exceed _____%. Purchaser shall pay the usual and customary
      charges imposed by the lending institution, including but not limited to credit and
      appraisal fees. Purchaser shall make timely application for and shall make every
      reasonable effort to obtain such commitment. If Purchaser is unable to obtain such
      commitment, Purchaser shall notify Seller, in writing, within said time. If Seller is not so
      notified, it shall be conclusively presumed that Purchaser has obtained such commitment
      or will purchase said Property without mortgage financing. If Seller is so notified, Seller
      may, at Seller's option, within forty-five (45) days after such notice, secure such
      commitment on behalf of Purchaser. Purchaser agrees to furnish Seller all requested
      credit information and to sign customary papers relating to the application and securing
      of said commitment. If Purchaser notifies Seller, as above provided, and Seller is
      unwilling or unable to secure such commitment as above provided, this Contract shall
      become null and void and all earnest money shall be returned to Purchaser.

4.    EARNEST MONEY: The earnest money deposited by Purchaser hereunder shall be held by
      __Atland Realty LLC_____ in a segregated interest bearing account for the mutual benefit
      of the parties, with interest thereon to be paid to Purchaser at the time of closing, except as
      otherwise herein provided.

5.    TITLE AND CONVEYANCE:

      (a)   Prior to the recording of the Warranty Deed hereunder, Seller shall cause to be recorded
            in the Office of the Recorder of Deeds of Cook County, Illinois, a Declaration of
            Condominium Ownership. Purchaser agrees that he will assume and hereby assumes as
            of the date of closing, the obligations appurtenant to his Unit under the Declaration of
            Condominium Ownership. At closing, Purchaser agrees to deposit with the
            Condominium Association an amount equal to two (2) months assessments based upon
            the initial budget of the Association, said sum to be used by the Association as a reserve
            for the operation and management of the Property as provided in the Declaration of
            Condominium Ownership. From and after the closing, Purchaser agrees to pay the
            monthly assessments for the Unit pursuant to the Declaration to the Greenview Point
            Condominium Association ("Association"). At closing, Seller shall furnish Purchaser
            with a statement from the Association certifying that Seller is current in the payment of
            assessments.

      (b)   On the Closing Date, Seller shall convey or cause to be conveyed to Purchaser good title
            to the Unit, the Limited Common Element Parking Space and the undivided interest in
            the Common Elements, by a Warranty Deed, subject only to the following: (a) General
            real estate taxes not yet due and payable; (b) Easements, covenants, conditions,
            restrictions and building lines of record, including any easement established by or
            implied from the Declaration of Condominium Ownership or amendments thereto, if any;
            (c) Applicable zoning and building laws or ordinances; (d) Encroachments, if any,
            provided that the title insurer is willing to issue its endorsement over said encroachments;
            (e) Acts done or suffered by Purchaser; (f) Limitations and conditions imposed by the
            Condominium Property Act of the State of Illinois; and (g) Declaration of Condominium
            Ownership and all amendments thereto, if any.

2

6.  PERSONAL PROPERTY: The Purchaser Price shall include the personal property set forth on Exhibit "B" attached hereto and made a part hereof. At closing, Seller shall deliver to Purchaser a Bill of Sale for said personal property. AS TO THE ABOVE ITEMS, AND AS TO ANY OTHER CONSUMER PRODUCT (AS THAT TERM MAY BE DEFINED UNDER APPLICABLE FEDERAL OR STATE LAWS) WHICH MAY BE CONTAINED IN THE UNIT, SELLER NEITHER MAKES NOT ADOPTS ANY WARRANTY OF ANY NATURE REGARDING SUCH APPLIANCES, FIXTURES, AND OTHER CONSUMER PRODUCTS, EXPRESS OR IMPLIED, AND EXPRESSLY EXCLUDES ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS.

7.  PRORATIONS:

    (a)  For closings occurring in 2007, Seller agrees to pay the 2006 real estate taxes (payable in 2007) for the entire Property promptly when due. Real estate taxes for the year 2008 shall be prorated between the parties at the time of closing based on the Purchaser's percentage ownership interest in the Unit multiplied by 110% of the most recent ascertainable annual real estate tax bill. At closing, Seller shall deposit with the title insurer, in escrow, its proportionate share of real estate taxes for the Unit for the year 2006 from January 1, 2006 to and including the day of closing. Purchaser shall deposit with the title insurer, in escrow, his or her proportionate share of the real estate taxes for the Unit for the year 2006 from the day after the date of closing through December 31, 2006. All prorations shall be final. Upon the issuance of the actual 2006 real estate tax bill, in the event that the total amount of real estate taxes deposited with the title insurer for the Unit is insufficient to pay in full the Unit's share of the 2006 real estate taxes, Purchaser shall be responsible for such deficiency.

    (b)  For closings occurring in the year 2007, Seller agrees to pay the Unit's share of the 2006 real estate tax bill in full. Real estate taxes for the year 2007 shall be prorated between the parties based on Purchaser's percentage ownership interest in the Unit multiplied by 110% of the most recent ascertainable annual real estate tax bill. At closing, Seller shall give Purchaser a credit for the 2007 real estate taxes for the period from January 1, 2007 to and including the date of closing. Such proration shall be final.

    (c)  Further, the condominium assessment for the month of closing and any other items customarily prorated are to be adjusted as of the date of closing. The parties agree that the hazard and liability insurance premium on the Condominium Building will be procured by Seller and Purchaser shall pay to Seller at closing the proportionate share of the premium for the Unit prorated from the date of closing to and including the termination date of the policy. All prorations shall be final.

8.  CLOSING DATE: The closing date shall be on such date following substantial completion of the Unit as shall be designated by Seller or its agent upon not less than seven (7) days prior written notice to Purchaser or upon such earlier date as may be agreed upon by Purchaser and Seller (the "Closing Date"). It is estimated by ___9/28/2007___, subject to delays occasioned be strikes, labor or material shortages, casualties, inclement weather conditions, acts of God and other causes beyond the reasonable control of Seller, If substantial completion of the Unit is delayed by reason of an Extra (as hereinafter defined), a credit item or other change to the Unit ordered by Purchaser, the Unit will be deemed to be substantially completed on the date the Unit would have been completed but for the extras, credit or other change. The Closing Date shall not be extended or delayed (not shall any of the Purchaser Price be withheld or escrowed) by reason of any work resulting from an extra, credit item or other change to the Unit ordered by Purchaser, nor by reason of punch list items.

3

9.    CLOSING: This sale shall be closed through an Escrow at the office of 171 N Clark, a Chicago
Title and Trust Company policy issuing agent, at their Chicago Loop office, (the "Agent"), in
accordance with the general provisions of the usual form of agency agreement then in use by the
Agent, provided Purchaser is obtaining a mortgage loan, otherwise through a Deed and Money
Escrow at the office of the Agent. Seller shall provide, at its cost, an Owner's Policy of Title
Insurance in the amount of the purchaser price showing title in Purchaser subject only to (i) the
matters to which this sale is subject, as hereinbefore provided and (ii) the general exceptions
contained in the title policy, with extended coverage over all general exceptions. Seller shall pay
for all charges normally attributable to Sellers, including the cost of the Owner's Title Insurance
Policy, title charges to clear title and state and county transfer stamps. Purchaser shall pay for all
charges normally attributable to Purchasers, including the title charges for a mortgage policy and
any special endorsements requested by Purchaser or Purchaser's lender, if any, agency closing
fee, charges for recording the Deed and mortgage documents and City of Chicago transfer
stamps.

10.   CONSTRUCTION:

(a)  Seller agrees that it will construct the Unit substantially in accordance with the plans and
specifications for the same which are on file in Seller's office, the Rider hereto, if any,
change orders entered into by Purchaser and Seller subsequent to the date hereof, if any, and
specifications, if any, attached hereto. The model unit, if any, maintained by Seller may
include nonstandard features and may not be relied upon as a model of what will be included
in the Unit when completed. Seller reserves the right to substitute or change materials or
brand names to those of similar color or similar or better quality or utility and to make
changes in construction as may be required by material shortages, strikes, work stoppages,
labor difficulties, or such emergency situations as may, in Seller's judgment, require same.
Seller agrees to proceed diligently with construction work. Seller shall not be liable, and the
obligation of Purchaser hereunder shall not in any manner be excused or varied if
construction shall be delayed or prevented by was, acts of God, riots, civil commotion,
government regulation, strikes, labor or material shortages, unseasonable weather conditions
or other causes beyond the control of Seller.

(b)  When notified by Seller, Purchaser shall make all color and material selections permitted for
the Unit among such samples and on such forms as Seller shall provide. If Purchaser fails to
make all or any part of such selections within ten (10) days from Seller's notice. Seller is
hereby authorized to complete the Unit as Seller may deem suitable.

(c)  If Purchaser desires any additional features in the Unit or any changes from the plans and
specifications, each such additional feature or change, if approved by Seller, shall constitute
either (i) an "Extra", if an additional cost is charged to Purchaser therefore, or (ii) a "Credit
Item", if Purchaser is to receive a credit therefore. All Extras and Credit Items requested by
Purchaser and approved by Seller and the charge or credit therefore shall be set forth in a
written amendment to this Contract executed by both Purchaser and Seller, NO EMPLOYEE
OR AGENT OF SELLER HAS AUTHORITY TO AGREE TO OR COMPLY WITH A
VERBAL REQUEST BY PURCHASER FOR AN EXTRA OR CREDIT ITEM OR ANY
CHANGE TO THE PLANS AND SPECIFICATIONS. Seller shall determine the charge for
any Extra or the credit for any Credit Item in its sole discretion, which may include charges
due to disruption of any part of the construction process caused by such change. The charge
for each Extra shall be paid to Seller within five (5) days of the execution of such written
amendment. Credit Items shall be set off against the charges for any Extras for the purpose
of aggregating the cost of the Extras. Any credit not set off against the cost of an Extra shall
be credited against the balance owed by Purchaser at closing.

4

(d) Upon notification from Seller that the Unit is substantially completed and ready for occupancy, within twenty-four (24) hours of the time of closing Purchaser shall have the right to inspect the Unit with an authorized representative of Seller for the purpose of preparing a list of all items of work which the parties agree are incomplete or subject to correction ("Punch List"). The Punch List shall be binding on Seller and Purchaser shall be thereafter barred from claiming that other work in the Unit is incomplete or subject to correction. Seller shall cause the items listed on the Punch List to be completed or corrected within sixty (60) days of the date of closing, subject to the availability of labor and/or materials and other circumstances beyond Seller's control. Purchaser shall provide Seller and Seller's agents to the Unit after the closing for the purpose of completing the items on the Punch List. Purchaser's failure to make such an inspection prior to closing or Seller's failure to complete or repair the items on the Punch List prior to closing shall not excuse Purchaser's obligation to close the transaction. Purchaser acknowledges that Seller may not complete certain work to the Common Elements or other Units in the building prior to closing and that such incomplete items shall not be included on the Punch List nor shall Seller's failure to complete same prior to closing excuse Purchaser's obligation to close hereunder.

11.    DEFAULT: If Purchaser defaults (fails to close on the date specified in the notice of the Closing Date), fails to make any payment when due or fails to fulfill any other obligation hereunder, all being considered a default hereunder, then at the election of Seller, all payments made by Purchaser plus accrued interest thereon may be retained by Seller as liquidated damages and this Contract shall become null and void, as Purchaser acknowledges and agrees that Seller's damages in the event of such a default by Purchaser would be difficult to ascertain. If Seller refuses or is unable to deliver title as herein provided or to carry out any material obligation or covenant hereunder to be performed by it prior to closing, or if this Contract is terminated prior to the time of closing for any reason other than a default of Purchaser, the sole and exclusive remedy of Purchaser shall be the return of his earnest money deposit and all accrued interest. Seller's sole liability shall be limited to the return of such funds to Purchaser.

12.    SELLER ACCESS: For the purpose of completing the sale promotion of this Condominium, Seller, its agents, successors and assigns are hereby given full right and authority to remain on the premises (excluding the subject Unit) until the sale of the last unit and maintain signs, transient parking, sales office and model Units, together with the rights of ingress and egress therefrom for Seller and any of Seller's agents, licensees or invitees.

13.    NO ASSIGNMENT OF CONTRACT BY PURCHASER: Purchaser shall not assign, set over or transfer this Contract or any of Purchaser's rights or interest hereunder without the prior written consent of Seller, and any purported assignment shall be void.

14.    ENTIRE AGREEMENT: This Contract constitutes the entire Agreement between the parties. No representations, undertakings or promises, whether oral or written, implied or otherwise, can be made or have been made by either Seller or its agents or brokers to Purchaser or to anyone, unless expressly stated or herein or unless mutually agreed in writing by both parties. All Amendments, Supplements or Riders hereto, if any, shall be in writing and executed by both parties. Purchaser shall not record the Contract or any memorandum hereof.

15.    PURCHASER RECEIPT: Purchaser acknowledges that Purchaser has received from Seller and has had an opportunity to review, in accordance with the Condominium Property Act of the State of Illinois (the "Act") and the Chicago Municipal Ordinance (the "Code") the Declaration of Condominium Ownership and By-Laws for the 400 Orleans Condominium, floor plan for the Unit and an estimate of monthly expenses for the Unit.

5

Seller reserves the right to make any changes in the Condominium Documents permitted by law, subject to the provisions of Section 22 of the Act. To the extent that Section 22 of the Act requires Purchaser's approval to certain changes in the Condominium Documents, Purchaser's sole remedy in the event of Purchaser's non-approval of such changes shall be to rescind this Contract within the time and manner provided in the Act.

16.    POSSESSION OF THE UNIT: Purchaser shall be entitled to occupancy and possession of the Unit from and after the closing upon payment in full by Purchaser to Seller of the Purchaser Price and all other required payments.

17.    WARRANTY:

(a)  SELLER SHALL DELIVER TO PURCHASER AT CLOSING THE CERTIFICATE OF LIMITED WARRANTY AND WAIVER AND DISCLAIMER OF IMPLIED WARRANTY AND HABITABILITY, ATTACHED HERETO AS EXHIBIT C, WHICH HAVE BEEN REVIEWED, APPROVED, ACCEPTED AND EXECUTED BY PURCHASER CONCURRENTLY WITH THE EXECUTION OF THIS CONTRACT. PURCHASER ACKNOWLEDGES THAT PURCHASER HAS READ AND UNDERSTANDS SUCH CERTIFICATE OF LIMITED WARRANTY AND WAIVER AND DISCLAIMER OF IMPLIED WARRANTY OF HABITABILITY. NO WARRANTY, GUARANTY OR UNDERTAKING, EXPRESS OR IMPLIED, WITH RESPECT TO THE CONSTRUCTION OF THE UNIT, EXCEPT AS SET FORTH IN THIS CONTRACT, SHALL BIND OR OBLIGATE SELLER.

(b)  PURCHASER ALSO ACKNOWLEDGES THAT PURCHASER HAS READ, REVIEWED, ACCEPTED AND APPROVED THE CERTIFICATE OF LIMITED WARRANTY FOR THE COMMON ELEMENTS AND WAIVER AND DISCLAIMER OF IMPLIED WARRANTY OF HABITABILITY FOR THE COMMON ELEMENTS, ATTACHED HERETO AS EXHIBIT D. THE CERTIFICATE OF LIMITED WARRANTY FOR THE COMMON ELEMENTS IS THE ONLY WARRANTY WITH RESPECT TO THE COMMON ELEMENTS MADE BY SELLER EXPRESS OR IMPLIED AND PURCHASER APPROVES THAT SUCH WARRANTY RUNS SOLELY TO THE ASSOCIATION.

18.    BROKER: Purchaser represents and warrants that no real estate broker, salesman or any other party was involved in this sale, other than the real estate broker or sales agent employed by Seller, except    Coldwell Banker              . Purchaser hereby agrees to indemnify, defend and hold Seller harmless from and against any loss, cost, damage or liability resulting from a claim by any other broker or finder claiming a right to commission or finder's fee for showing or introducing Purchaser to this Unit. Seller will pay a real estate brokerage as set forth in the listing agreement executed by Seller and Atland Realty only upon a fully consummated closing of this transaction.

19.    RESPA: Seller and Purchaser hereby agree to make all disclosures and do all things necessary to comply with the applicable provisions of the Real Estate Settlement Procedures Act of 1974, as amended.

20.    NOTICES: All notices and demands shall be in writing and served upon Seller, 400 N. Orleans, LLC c/o Steven Siegel, 600 A Waukegan Road, Northbrook IL, and upon Purchaser at the home address shown above or at such other address as either party may designate by written notice to the other. Notice mailed by certified mail, return receipt requested, shall be deemed to be served on the date mailed or on the date such notice is personally delivered. Notices may also be served facsimile transmittal.

6

21. **CONTRACT CONSTRUCTION:** This Contract shall be construed in accordance with the laws of the State of Illinois.

22. **ATTORNEY'S MODIFICATION:** It is agreed by and between the parties hereto that their respective attorneys may make modifications to the Contract other than sales price, broker's compensation and dates, mutually acceptable to the parties. If within ten (10) business days *SEE EXHIBIT A* after the acceptance date of the Contract, it becomes evident that agreement cannot be reached by the parties regarding the proposed modifications of their attorneys and written notice thereof is given to either party within the period specified herein, then this Contract shall become null and void and all monies paid by Purchaser shall be refunded upon joint written direction of both parties to the escrowee. IN THE ABSENCE OF WRITTEN NOTICE WITHIN THE TIME SPECIFIED HEREIN, THIS PROVISION SHALL BE DEEMED WAIVED BY ALL PARTIES HERETO AND THIS CONTRACT SHALL BE IN FULL FORCE AND EFFECT.

Date: 7/4/07

Date Accepted: 7/5/07

PURCHASER:

Bryan W Clark (sign)

BRYAN W. CLARK (print)

SS# 261 61 5574

_____ (sign)

_____ (print)

SS# _____

SELLER:
400 N. ORLEANS, LLC

By: _____

Purchaser's Attorney:

_____

_____

_____

Seller's Attorney:

Direct correspondence to: Steven Siegel
                          600A N Waukegan Rd
                          Northbrook, IL 60062
                  Attorney: Marc Cervantes,
                          75 E. Wacker Dr.
                          Suite 700
                          Chicago, IL 60601
                          312-606-9529 ph
                          312-873-4518 fx

BWC

7





**Rider 5**
**INTEREST BEARING ACCOUNT RIDER**

THIS RIDER IS MADE A PART OF AND INCORPORATED INTO THAT CERTAIN REAL ESTATE SALE CONTRACT DATED _____, _____ FOR THE SALE OF THE PROPERTY COMMONLY KNOWN AS _____, ILLINOIS, ENTERED INTO BY _____ (SELLER) AND _____ *BRYAN  W.  CLARK* _____ (PURCHASER).

It is agreed by and between the parties hereto that the total earnest money held in the amount of $ *1000.00* with regard to the above captioned Contract shall bear interest for and be paid to the party listed on the W-9 form below.
*$ 44000 MORE*
*iN 10 DAYS*

**Form W-9. Payer's Request for Taxpayer Identification Number.**

| Form W-9 (Rev. January 1993) Department of the Treasury Internal Revenue Service | **Request for Taxpayer Identification Number and Certification** | **Give this form to the requester. Do NOT send to IRS.** |
|---|---|---|

Name (If joint names, list first and circle the name of the person or entity whose number you enter in Part I below. See instructions under "Name" if your name has changed.
*BRYAN  W.  CLARK*

Address (number and street)
*4722 W. SEVILLA ST.*

List account number(s) here (optional)

City, state, and ZIP code
*TAMPA  FL  33629*

| Part I  **Taxpayer Identification Number** | | Part II  **For Payees Exempt From Backup Withhold (See Instructions)** |
|---|---|---|
| Enter your taxpayer identification number in the appropriate box. For individuals and sole proprietors, this is your social security number. For other entities, it is your employer identification number. If you do not have a number, see *How To Obtain a TIN*, below. | Social Security number  *261 + 61 + 5574* | |
| | **OR** | Requester's name and address (optional) |
| **Note:** *If the account is in more than one name, see the chart on page 2 for guidelines on whose number to enter.* | Employer identification number | |

**Certification.** —Under penalties of perjury, I certify that:

(1)  The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

(2)  I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding (does not apply to real estate transactions, mortgage interest paid, the acquisition or abandonment of secured property, contributions to an individual retirement arrangement (IRA), and payments other than interest and dividends).

**Certification instructions.** --You must cross out item (2) above if you have been notified by IRS that your are currently subject to backup withholding because of underreporting interest or dividends on your tax return. (Also see Signing the Certification under Specific Instructions, on page 2.)

Please Sign Here  Signature ► *Bryan W Clark*     Date ► *7/6/07*

(Dated)  *7/6/07*
*Bryan W Clark*
_____ (Purchaser)

(Dated) _____
_____ (Seller)

_____ (Purchaser)     _____ (Seller)

REV 04/03
CHI #96900 v2

Phone:     Fax:
Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035. (800) 383-9805 www.zipform.com



**ATLAND**
R E A L T Y

*a Limited Liability Company*

## EARNEST MONEY DEPOSIT RECIEPT

DATE OFFICE RECEIVED: _7/6/07_    INITIAL: _NT_

PROPERTY: _400 N Orleans Unit D_

BUYER: _Bryan Clark_

DATE BANK RECEIVED: _7/6/07_

BANK RECIPIENT SIGNATURE: _L. Wilczynski_

PLEASE ATTACH CHECK AND PHOTOCOPY:

---

BRYAN W. CLARK
4222 W. SEVILLA STREET
TAMPA, FL 33629-8406

548

63-868/631
3

Date _7/2/07_

Pay to the
Order of _ATLAND REALTY LLC_ $ 1,000.00

_One Thousand and No/100_ Dollars

**The Bank of Tampa**
POST OFFICE BOX ONE
TAMPA, FLORIDA 33601-0001

MINARET
Diamond

For _400 ORLEANS_

BW Clark

⑆063108680⑆0548 318047131⑈

Jul 06 07 03:10p        Bryan W. Clark                          813-837-1915            p.2

To: Steve Siegel   Page 9 of 20                2007-07-05 14:07:54 (GMT)                13128032504  From: Jennifer Liu

Jul 04 07 11:14p        Bryan W. Clark                                    813-837-1915           p 9

## EXHIBIT "A"

1. Purchaser has been given 10 days attorney approval and all mortgage issues must be resolved within that time including appraisal. All finishes must be selected and finalized during this time period as well.

2. Price includes:

    a. Cable north wall of Den

    b. Euro height bathroom cabinets  *36" TALL  BWC*

    c. 53500 closet system allowance            *BWC*

    d. hardwood floors in first level bedrooms  *To MATCH FirsT lEvEl Living Room*

    e. Master bedroom closet has no door and will be wood cased opening

    f. remove master bedroom door (leave for purchaser to store) – 3 foot opening wood cased–  *BWC*

    g. floor cable outlet in master on North side of room by existing floor outlet  *KSCS25FTSS*

    h. Kitchen Aid Architect Series Refrigerator Model #KSRS25BHSS need to verify that this style number has the same features and finishes and is similar to KBLC36FT stainless steel model number to be confirmed during attorney approval period.  *KSCS25FTSS*

    i. Kitchen Aid Architect Series Dishwasher Model #KUDN03TSJ need to verify that this style number has the same features and finishes and is similar to KUDS05FTSS stainless steel model number to be confirmed during attorney approval period.  *KUDS03CTSS BWC*

    j. Kitchen Aid Architect Series Microwave Model #KBMC147HSS need to verify that this style number has the same features and finishes and is similar to KBMS1454RSS stainless steel model number to be confirmed during attorney approval period.  *KBMS1454RSS  BWC*   *SEALED BURNER  VGRC3074BSS  BWCS*

    k. Viking Range 30" cook top Model #2G130543SS need to verify that this style number has the same features and finishes and is similar to VGSU professional series self cleaning 30" stainless steel model number to be confirmed during attorney approval period.

    l. Viking Hood 30" Model #TBD – only one model will fit in this kitchen. Will verify model number during attorney approval period.  *VLWH36H855  BWCS*

    M. Island is 9 feet in length and the counter is 1 ¼"granite straight edge with granite ledge measuring 36" bowing to 42" and back to 36'

      n.    Purchaser may pick 1 paint color for the main/1ˢᵗ level to go thru out that floor and another color for the 2ⁿᵈ floor/master bedroom

      o.    Purchaser has a $35 per sf allowance for the carpet in the master bedroom.  *BWC*

8

Exhibit "A" continued for Unit D 400 N. Orleans – Bryan W. Clark

p.    Purchaser has an allowance of $30/sf for tiles and stones for each bathroom

q.    Purchaser will receive a list of the standard granite selections on Thursday. Any choices not standard purchaser understand there may be an upgrade charge but can not be determined until finish selections are final.

9

EXHIBIT "B"

Personal Property

DISHWASHER  KUDS03CTSS  Kitchen Aid

RANGE Model # see exhibit A

REFRIGERATOR Model # see exhibit A

DISHWASHER Model # see exhibit A

MICROWAVE Model # see exhibit A

FURNACE

CONDENSOR

DISPOSAL

WHIRLPOOL

10

07/06/2007 11:27 FAX   00000000000                                                                                    004/004

Jul 05 07 03:10p      Bryan W Clark                                         613-637-1915            p.4



07/05/2007 10:28 FAX  00000000000                                      ☐ 019/019

To: Steve Siegel   Page 20 of 20              2007-07-05 14:07:54 (GMT)              13126032304  From: Jennifer Liu

Jul 04 07 11:17p        Bryan W. Clark                              813-837-1915              p.19



## EXHIBIT "C"

### Certificate of Limited Warranty

#### (Purchased Unit)

400 N. ORLEANS, LLC, an Illinois limited liability company ("Seller") warrants the Property commonly known as Unit No.____D____, 400 Orleans Condominium, 400 N. Orleans, Chicago, Illinois against latent defects arising out of faulty workmanship or materials for a period of one (1) year from the date of closing (the "Warranty Period"). Seller's sole obligation under this Limited Warranty is limited to the repair or replacement, at Seller's option, of the defect. For the purpose of this Limited Warranty, "latent defects" are limited to those defects which are not apparent at the time of Purchaser's preoccupancy inspection of the Unit but which become apparent prior to the expiration of the Warranty Period.

THIS LIMITED WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES OF SELLER, EITHER EXPRESS OR IMPLIED (INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MECHANTABILITY, HABITABILITY OR FITNESS FOR A PARTICULAR PURPOSE) AND INURES ONLY TO THE BENEFIT OF THE PURCHASER WHO HAS SIGNED AND APPROVED THIS LIMITED WARRANTY.

AS TO ANY PERSONAL PROPERTY AND AS TO ANY CONSUMER PRODUCT (AS THAT TERM MAY BE DEFINED UNDER APPLICABLE FEDERAL, STATE OR LOCAL LAWS OR THEIR IMPLEMENTING REGULATIONS) WHICH MAY BE CONTAINED IN THE UNIT, SELLER NEITHER MAKES NOR ADOPTS ANY WARRANTY WHATSOEVER AND SPECIFICALLY EXCLUDES EXPRESS OR IMPLIED WARRANTIES OF ANY NATURE, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABLITY OR FITNESS FOR A PARTICULAR PURPOSE. IN THE EVENT ANY ITEM WARRANTED HEREIN IS DEEMED TO BE A CONSUMER PRODUCT UNDER THE MAGNUSON-MOSS WARRANTY FEDERAL TRADE COMMISSION IMPROVEMENT ACT, THEN AND ONLY IN THAT EVENT, THE DISCLAIMER OF IMPLIED WARRANTY SHALL COMMENCE FROM AND AFTER THE EXPIRATION OF THE EXPRESS WARRANTIES SET FORTH HEREIN.

This Limited Warranty is subject to the following terms, conditions and exclusions, all of which are an integral part hereof.

1.  WARRANTY EXCLUSIONS: The following exclusions and limitations apply to Seller's limited warranty obligations:

    (a)  Nail or screw pops or cracks in the floors, walls or ceilings are not covered by this Warranty, since such conditions do not result from faulty workmanship or defective materials but are the result of natural shrinkage, drying out of building materials, normal settlement of the Unit or other normal movement of the components. If abnormal conditions, as determined by Seller, exist with respect to these items, Seller will correct such conditions, within a reasonable time.

    (b)  All chips, scratched or mars on items such as tile, walls, porcelain, glass (including breakage and cracks) plumbing fixtures, plastic laminate counter tops or marble, must be noted on Seller's preoccupancy inspection form (the "punch list") or they will not be covered under this Limited Warranty.

11

(c) This Limited Warranty does not cover ordinary wear and tear or damage due to misuse or neglect, negligence or failure to provide proper maintenance. This Limited Warranty does not cover items which have been modified or repaired by Purchaser or any items which are installed or constructed pursuant to a separate contract or agreement between the Purchaser and any other party other than Seller.

2. MANUFACTURER'S WARRANTIES: Certain personal property and equipment within the Unit are supplied with manufacturer's instructions and warranties. It is recommended that the manufacturer's instruction pamphlets be read and followed. Seller does not adopt any such manufacturer's warranties. In the event of defects in such products, Purchaser should contact the manufacturer directly. Seller is not responsible for the performance of any manufacturer under such manufacturer's warranty.

3. OTHER ITEMS: This Limited Warranty specifically excludes any and all secondary, incidental or consequential damages caused by any defect or breach hereof. No steps taken be Seller to correct defects shall act to extend the scope or duration of this Limited Warranty beyond the Warranty Period. No representative of the Seller has the authority to expand or extend the scope or duration of this Limited Warranty beyond the Warranty Period or to make verbal agreements with respect thereto. All items for correction must be in written form. Seller assumes no responsibility if a Purchaser allows someone to enter the Unit when Purchaser is not present. This Limited Warranty is not assignable and any attempted assignment shall be null and void.

4. NOTICES: Any notices hereunder shall be personally delivered or sent by certified or registered mail, return receipt requested, addressed:

If to Seller:          400 N. Orleans, LLC
                       c/o Steven Siegel
                       600A N Waukegan Rd.
                       Northbrook, IL 60062

If to Purchaser, to the address of the Unit.

   Any notice mailed as aforesaid shall be deemed received three (3) business days after deposit in the United States mail.

5. ARCHITECT DECISION: In the event of any dispute hereunder as to the existence of any defect, which dispute is not resolved by Seller and Purchaser, such dispute shall be submitted to and resolved by the Seller's architect whose decision shall be final and binding upon the parties. The fees for such architectural firm incurred in resolving any such dispute shall be paid by the party against whom the decision is rendered.

Dated: 7\5\07

400 N. ORLEANS, LLC

By:

12

The undersigned have read and approved the Limited Warranty, including the terms, conditions and exclusions thereto and agree that said Certificate of Limited Warranty is in lieu of any warranty of Seller under the Condominium Purchase Agreement or implied at law and shall govern in the event of any conflict or inconsistency between the terms hereof and the said Purchase Agreement.

Purchaser(s):

13

## WAIVER AND DISCLAIMER OF IMPLIED WARRANTY OF HABITABILITY

### (Purchased Unit)

This WAIVER AND DISCLAIMER is dated _____July 3_____, 2007, be and between 400 N. ORLEANS, LLC, (hereinafter referred to as "Seller-Developer") and __Bryan W. Clark____ (hereinafter referred to as "Purchaser") for the purchase and sale of real estate commonly known as 400 Orleans Condominium, 400 N. Orleans, Unit No. __D__, Chicago, Illinois.

1.  IMPLIED WARRANTY OF HABITABILITY: Illinois law provides that every contract for the purchase of a new home, as here, carries with it a warranty that when completed, the home will be free of defects and will be fit for its intended use as a home. This law further provides that this Implied Warranty does not have to be in writing to be part of the Contract and it covers not only structural and mechanical defects such as may be found in the foundation, roof, masonry, heating, electrical and plumbing, but also covers any defect workmanship which may not be easily seen by the Purchaser. However, the law also provides that a Seller-Developer and Purchaser may agree in writing, as here, that this Implied Warranty is not part of their particular contract.

2.  WAIVER-DISCLAIMER: 400 N. ORLEANS, LLC THE SELLER-DEVELOPER, HEREBY DISCLAIMS, AND THE PURCHASER _____Bryan W. Clark_____ HEREBY WAIVES THE IMPLIED WARRANTY OF HABITABILITY DESCRIBED IN PARAGRAPH 1 ABOVE AND THEY ACKNOWLEDGE AND AGREE THAT IT IS NOT PART OF THE CONTRACT.

3.  EFFECT AND CONSEQUENCES OF THIS WAIVER-DISCLAIMER: Purchaser acknowledges and understands that if a dispute arises with the Seller-Developer and the dispute results in a lawsuit, Purchaser will not be able to reply on the Implied Warranty of Habitability described in paragraph 1 above as a basis for suing the Seller-Developer or as the basis of a defense if Seller-Developer sues the Purchaser. Purchaser may, however, rely on the Seller-Developer's express written warranties.

I/WE, AS PURCHASER, HAVE READ AND DO UNDERSTAND THIS DOCUMENT AND I/WE HAD AN OPPORTUNITY TO SEEK PROFESSIONAL LEGAL ADVISE CONCERNING ITS CONTENTS.

PURCHASER:                                              SELLER:
                                                        400 N. ORLEANS, LLC

_____                               By:_____

_____

14

## EXHIBIT "D"

## CERTIFICATE OF LIMITED WARRANTY

### (Common Elements)

   400 N. ORLEANS. LLC, an Illinois limited liability company ("Seller") warrants the Common Elements in the Property commonly known as Unit No. __D____, 400 Orleans Condominium, 400 N. Orleans, Chicago, Illinois against latent defects arising out of faulty workmanship or materials for a period of one (1) year from the date on which each particular portion of the Common Elements was substantially completed ("Substantial Completions Date") or for such shorter period specified below (the "Warranty Period"). Seller's sole obligation under this Limited Warranty is limited to the repair or replacement, at Seller's option, of the defect.

   THIS LIMITED WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES OF SELLER, EITHER EXPRESS OR IMPLIED (INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MECHANTABILITY, HABITABILITY OR FITNESS FOR A PARTICULAR PURPOSE) AND INURES ONLY TO THE BENEFIT OF GREENVIEW POINT CONDOMINIUM ASSOCIATION (THE "ASSOCIATION") AND NOT TO ANY UNIT OWNER INDIVIDUALLY.

   AS TO ANY PERSONAL PROPERTY AND AS TO ANY CONSUMER PRODUCT (AS THAT TERM MAY BE DEFINED UNDER APPLICABLE FEDERAL, STATE OR LOCAL LAWS OR THEIR IMPLEMENTING REGULATIONS) WHICH MAY BE CONTAINED IN THE COMMON ELEMENTS, SELLER NEITHER MAKES NOR ADOPTS ANY WARRANTY WHATSOEVER AND SPECIFICALLY EXCLUDES EXPRESS OR IMPLIED WARRANTIES OF ANY NATURE, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABLITY OR FITNESS FOR A PARTICULAR PURPOSE. IN THE EVENT ANY ITEM WARRANTED HEREIN IS DEEMED TO BE A CONSUMER PRODUCT UNDER THE MAGNUSON-MOSS WARRANTY FEDERAL TRADE COMMISSION IMPROVEMENTACT, THEN AND ONLY IN THAT EVENT, THE DISCLAIMER OF IMPLIED WARRANTY SHALL COMMENCE FROM AND AFTER THE EXPIRATION OF THE EXPRESS WARRANTIES SET FORTH HEREIN.

   This Limited Warranty is subject to the following terms, conditions and exclusions, all of which are an integral part hereof.

1. WARRANTY EXCLUSIONS: The following exclusions and limitations apply to Seller's limited warranty obligations:

  (a) This Limited Warranty is limited to the Common Elements and does not cover the Purchased Unit.

  (b) Nail or screw pops or cracks in the floors, walls or ceilings are not covered by this Warranty, since such conditions do not result from faulty workmanship or defective materials but are the result of natural shrinkage, drying out of building materials, normal settlement of the Unit or other normal movement of the components. If abnormal conditions, as determined by Seller, exist with respect to these items, Seller will correct such conditions, within a reasonable time.

  (c) This Limited Warranty does not cover ordinary wear and tear or damage due to misuse or neglect, negligence or failure to provide proper maintenance. This Limited Warranty does not cover items which have been modified or repaired by the Association or any Unit Owner or any

15

items which are installed or constructed pursuant to a separate contract or agreement between the Association or any Unit Owner and any other party other than Seller.

2. MANUFACTURER'S WARRANTIES: Certain personal property and equipment within the Common Elements are supplied with manufacturer's instructions and warranties. It is recommended that the manufacturer's instruction pamphlets be read and followed. Seller does not adopt any such manufacturer's warranties. In the event of defects in such products, the Association should contact the manufacturer directly. Seller is not responsible for the performance of any manufacturer under such manufacturer's warranty.

3. OTHER ITEMS: This Limited Warranty specifically excludes any and all secondary, incidental or consequential damages caused by any defect or breach hereof. No steps taken be Seller to correct defects shall act to extend the scope or duration of this Limited Warranty beyond the Warranty Period. No representative of the Seller has the authority to expand or extend the scope or duration of this Limited Warranty beyond the Warranty Period or to make verbal agreements with respect thereto. All items for correction must be in written form. Seller assumes no responsibility if a Purchaser allows someone to enter the Unit when Purchaser is not present. This Limited Warranty is not assignable and any attempted assignment shall be null and void.

4. NOTICES: Any notices hereunder shall be personally delivered or sent by certified or registered mail, return receipt requested, addressed:

    If to Seller:        400 N. ORLEANS, LLC
                         c/o Steven Siegel
                         600A N Waukegan Rd.
                         Northbrook, IL 60062

    If to the Association, to the address of the Property.

    Any notice mailed as aforesaid shall be deemed received three (3) business days after deposit in the United States mail.

5. ASSOCIATION: Seller's obligations under this Limited Warranty are for the sole benefit of the Association and may be enforced or modified by the Association only and not by any Unit Owners individually or collectively.

6. ARCHITECT DECISION: In the event of any dispute hereunder as to the existence of any defect, which dispute is not resolved by Seller and the Association. such dispute shall be submitted to and resolved by the Seller's architect whose decision shall be final and binding upon the parties. The fees for such architectural firm incurred in resolving any such dispute shall be paid by the party against whom the decision is rendered.

Dated: 7/5/07

400 N. ORLEANS, LLC

By: _____

16

The undersigned have read and approved the Limited Warranty, including the terms, conditions and exclusions thereto and agree that said Certificate of Limited Warranty is in lieu of any warranty of Seller including those implied at law.

Purchaser(s): _____

_____

17

07/05/2007 10:26 FAX  00000000000                                                                  ☑018/019
To: Steve Siegel  Page 19 of 20                        2007-07-05 14:07:54 (GMT)                13128032304  From: Jennifer Liu

Jul 04 07 11:16p        Bryan W. Clark                                          813-837-1915              p.18

## WAIVER AND DISCLAIMER OF IMPLIED WARRANTY OF HABITABILITY

### (Common Elements)

This WAIVER AND DISCLAIMER is dated ___July 3____, 2007, be and between 400 N. ORLEANS, LLC, (hereinafter referred to as "Seller-Developer") and _____Bryan W. Clark____, (hereinafter referred to as "Purchaser") for the purchase and sale of real estate commonly known as 400 Orleans Condominium, 400 N. Orleans, Unit No. __D___, Chicago, Illinois.

1.  IMPLIED WARRANTY OF HABITABILITY: Illinois law provides that every contract for the purchase of a new home, as here, carries with it a warranty that when completed, the home will be free of defects and will be fit for its intended use as a home. This law further provides that this Implied Warranty does not have to be in writing to be part of the Contract and it covers not only structural and mechanical defects such as may be found in the foundation, roof, masonry, heating, electrical and plumbing, but also covers any defect workmanship which may not be easily seen by the Purchaser. However, the law also provides that a Seller-Developer and Purchaser may agree in writing, as here, that this Implied Warranty is not part of their particular contract.

2.  WAIVER-DISCLAIMER: 400 N. ORLEANS, LLC THE SELLER-DEVELOPER, HEREBY DISCLAIMS, AND THE PURCHASER ____Bryan W. Clark____ HEREBY WAIVES THE IMPLIED WARRANTY OF HABITABILITY DESCRIBED IN PARAGRAPH 1 ABOVE AND THEY ACKNOWLEDGE AND AGREE THAT IT IS NOT PART OF THE CONTRACT.

3.  EFFECT AND CONSEQUENCES OF THIS WAIVER-DISCLAIMER: Purchaser acknowledges and understands that if a dispute arises with the Seller-Developer and the dispute results in a lawsuit, Purchaser will not be able to reply on the Implied Warranty of Habitability described in paragraph 1 above as a basis for suing the Seller-Developer or as the basis of a defense if Seller-Developer sues the Purchaser. Purchaser may, however, rely on the Seller-Developer's express written warranties.

I/WE, AS PURCHASER, HAVE READ AND DO UNDERSTAND THIS DOCUMENT AND I/WE HAD AN OPPORTUNITY TO SEEK PROFESSIONAL LEGAL ADVISE CONCERNING ITS CONTENTS.

PURCHASER:                                          SELLER:
                                                    400 N. ORLEANS, LLC

_____                           By:_____

_____

18

# EXHIBIT  B

ATTORNEY MODIFICATIONS RIDER

ATTACHED TO AND MADE PART OF
CONDOMINIUM PURCHASE AGREEMENT
DATED JULY 4, 2007 AND ACCEPTED JULY 8, 2007

BY AND BETWEEN

400 N. ORLEANS, LLC, AS SELLER
AND
BRYAN W. CLARK, AS PURCHASER

FOR THE PREMISES COMMONLY KNOWN AS
UNIT #D and PARKING UNIT TBD
400 N. ORLEANS STREET, CHICAGO, ILLINOIS, 60610

1.    If there is any conflict between the terms of the Condominium Unit Purchase Agreement (the "Agreement") and this Rider, this Rider shall control.  The "Agreement" shall be deemed to include the Agreement, this Rider, all attorney modifications, together with exhibits and riders contained in or attached to any of those, as well as any change orders and color and material selections executed on or after the date of the Agreement, and the Punch List, and all of those documents, taken together, shall constitute the entire Agreement between the parties.

2.    The following shall be added at the end of Paragraph 5(a):  "At closing, Seller shall provide a copy of the recorded Declaration, including any amendments thereto, including copies of the page(s) of the plat showing the Unit and/or the Parking Space."

3.    The following shall be added as Paragraph 5(c):  "Seller shall provide, no later than 14 days prior to closing, a title commitment dated after the Contract Date, issued by Chicago Title Insurance Company, committing to issue to Purchaser an ALTA 1992 Form B owner's policy of title insurance in the amount of the Purchase Price (the "Title Commitment"), showing fee simple title to the Real Estate in Seller, subject only to the exceptions set forth in Paragraph 5(b) of this Contract, and such other exceptions as may be removed from or insured over in the title policy issued in accordance with the Title Commitment with the payment of a definite or ascertainable amount at the Closing (the "Permitted Exceptions").  Seller shall, at Seller's cost, cause exceptions other than the Permitted Exceptions to be removed or insured over to Purchaser's satisfaction prior to or at the Closing."

4.    Paragraph 8 shall be amended to provide that Seller shall provide not less than fourteen (14) days prior written notice to Purchaser of a Closing Date, and that in no event shall the Closing Date be any later than October 31, 2008, except with Purchaser's written consent.

5.    Paragraph 9 shall be amended to provide that the closing shall take place at the offices of Chicago Title Insurance Company.

6.    Add the following at the end of Paragraph 8: "Purchaser shall not be obligated to close unless the Unit is substantially complete, which the parties agree shall include completion and operating condition of the elevator.

7.    Add the following at the end of Paragraph 7(c): "Seller acknowledges its obligation under the Condominium Property Act, as Developer, to pay all assessments for all unsold units from and after the date of the sale of the first unit."

8.    Add the following at the end of Paragraph 9: "The parking space shall be insured by the Title Company as a limited common element."

9.    Paragraph 10(d) shall be modified to provide that Purchaser shall be permitted to be accompanied at the Punch List inspection by an inspector of his choosing, at Purchaser's sole cost and expense.  The Punch List completion and correction period shall be sixty (60) days.

10.    The phrase "refuses or" shall be deleted from the second sentence of paragraph 11.  At the end of that same sentence, the phrase "plus any other sums theretofore paid by Purchaser" shall be added.

11.    Add the following at the end of paragraph 11: "Notwithstanding the foregoing, if Purchaser is unable to attend the closing on the scheduled time and date as a result of a substantial hardship, including but not limited to severe illness, hospitalization, death in the family, or obligatory business travel, Purchaser shall have at least five (5) days after giving a notice thereof to Seller to reschedule the closing, and this will not be considered a default or breach of the Purchaser.

12.    The following shall be added to Paragraph 20: "Notice to Purchaser shall likewise be made to Purchaser's attorney, namely, Leo G. Aubel, Deutsch, Levy & Engel, 225 W. Washington Street, 17th Floor, Chicago, Illinois, 60606, (312) 853-8455, Fax: (312) 853-8465."

13.    Seller shall represent the following as of closing:

    A.    The Property shall constitute a fully improved lot and all water, sewer, gas, telephone hookups and connections (but not service), drainage and electrical facilities and all other utilities and public or quasi-public improvements on or adjacent to the Unit required by law or for the normal operation of the Unit will be installed and connected under valid permits, in good working order, adequate to serve the Unit and fully paid for through the date of Closing.

B.    The Unit has been built in accordance with all applicable covenants, zoning ordinances, building line requirements and building code requirements of any authority, governmental or otherwise, having jurisdiction over the work;

C.    There are no unpaid installments of any special tax or special assessment, and that Seller will disclose, at Closing, any notice received by Seller of any prospective special tax or special assessment.

D.    Seller is not be in receipt of any notice for zoning, environmental, building, fire, health code violations or other dwelling code violation at the subject premises from any governmental body and on information and belief shall represent that at the time of Closing there are none.

IN WITNESS WHEREOF, the parties have signed this Rider as of the 8th day of July, 2007.

FOR SELLER:                                        FOR PURCHASER:

3

# EXHIBIT  C

# FAX COVER SHEET

FROM:   Leo G. Aubel, Esq.
        Deutsch, Levy & Engel, Chtd.
        225 W. Washington Street, 17th Floor
        Chicago, Illinois 60606
        (312) 346-1460 x225
        Direct Line: (312) 853-8455
        Fax: (312) 853-8465
        Aubel@dlec.com

TO:     Marc Cervantes
CC:     Elizabeth Ballis
        Bryan Clark
        Lisa Baehm
FAX:    312-873-4518 and marc@cervanteslawfirm.com
        Elizabeth.ballis@cbexchange.com
        bryan@sunshinestatedrywall.com
        lbaehm@atlandrealty.com
RE:     400 N. Orleans to Clark
        400 N. Orleans, Unit D, Chicago
DATE:   October 19, 2007
PAGES:  1, including cover sheet

As you know, the outside Closing Date pursuant to Paragraph 4 of the Attorney Modifications Rider is October 31, 2007. Pursuant to that same Paragraph, Purchaser was to receive not less than fourteen (14) days prior written notice of a Closing Date. Purchaser did not receive that notice on a timely basis.

It has become apparent that Purchaser will be denied entry to the Unit to examine construction progress. From the street, it appears that neither cabinets nor elevator have been installed. Indeed, it appears that little work has been done in this Unit since the upgrades were selected. We therefore believe it to be unlikely that the October 31, 2007 Closing Date can be met. As you will recall, the Purchaser is transferring in from out of state, and needs to move into premises ready for delivery. This Unit is not and very likely will not be substantially complete by October 31, 2007.

Without being construed as an anticipatory breach, Purchaser would respectfully request that the Seller consider entering into an agreed termination of the Condominium Purchase Agreement which would include the prompt refund of all deposits heretofore made by Purchaser. Please review and advise.

# EXHIBIT  D

# *Cervantes & Cioffi LLP*

1101 W. Fulton Market, Suite 300 • Chicago, Illinois 60607 • Office: 312-421-0808 • Fax: 312-873-4518

October 19, 2007

**(VIA FAX: 312.853.8465)**
Mr. Leo G. Aubel, Esq.
Deutsch, Levy & Engel, Chtd.
225 W. Washington Street, Suite 1700
Chicago, IL 60606

Re: 400 N. Orleans, Unit D, Chicago, IL (400 N. Orleans, LLC to Clark)

Dear Mr. Aubel:

As you are aware, I represent 400 N. Orleans, LLC in the sale of the above referenced property.

My office is in receipt of your fax dated October 19, 2007, regarding Paragraph 4 of the Attorney Modifications Rider.

Based upon Paragraph 4 of the Attorney Modifications Rider that is dated July 4, 2007, accepted July 8, 2007, and accepted by the Sellers on July 20, 2007, the Closing Date shall be no later than <u>October 31, 2008</u>, and Notice shall be provided not less than fourteen days prior to the Closing Date. I have attached aforementioned Agreement and relevant fax confirmations for your review.

As such, your request to terminate the Condominium Purchase Agreement is respectfully declined.

However, please be advised that prompt notice will be sent to your office when a Closing Date can be scheduled.

Please contact the undersigned should you have any questions or concerns.

Sincerely,

Marc A. Cervantes

Cc: 400 N. Orleans LLC (847-562-9801)
    Atland Realty (312-587-9401)

Email address: marc@cervanteslawfirm.com • Website: www.cervanteslawfirm.com

10/19/2007 12:35 FAX 13127382870          CANON                                    002/007

ATTORNEY MODIFICATIONS RIDER

ATTACHED TO AND MADE PART OF
CONDOMINIUM PURCHASE AGREEMENT
DATED JULY 4, 2007 AND ACCEPTED JULY 8, 2007

BY AND BETWEEN

400 N. ORLEANS, LLC, AS SELLER
AND
BRYAN W. CLARK, AS PURCHASER

FOR THE PREMISES COMMONLY KNOWN AS
UNIT #D and PARKING UNIT TBD
400 N. ORLEANS STREET, CHICAGO, ILLINOIS, 60610

1.  If there is any conflict between the terms of the Condominium Unit Purchase Agreement (the "Agreement") and this Rider, this Rider shall control.  The "Agreement" shall be deemed to include the Agreement, this Rider, all attorney modifications, together with exhibits and riders contained in or attached to any of those, as well as any change orders and color and material selections executed on or after the date of the Agreement, and the Punch List, and all of those documents, taken together, shall constitute the entire Agreement between the parties.

2.  The following shall be added at the end of Paragraph 5(a):  "At closing, Seller shall provide a copy of the recorded Declaration, including any amendments thereto, including copies of the page(s) of the plat showing the Unit and/or the Parking Space."

3.  The following shall be added as Paragraph 5(c):  "Seller shall provide, no later than 14 days prior to closing, a title commitment dated after the Contract Date, issued by Chicago Title Insurance Company, committing to issue to Purchaser an ALTA 1992 Form B owner's policy of title insurance in the amount of the Purchase Price (the "Title Commitment"), showing fee simple title to the Real Estate in Seller, subject only to the exceptions set forth in Paragraph 5(b) of this Contract, and such other exceptions as may be removed from or insured over in the title policy issued in accordance with the Title Commitment with the payment of a definite or ascertainable amount at the Closing (the "Permitted Exceptions").  Seller shall, at Seller's cost, cause exceptions other than the Permitted Exceptions to be removed or insured over to Purchaser's satisfaction prior to or at the Closing."

4.  Paragraph 8 shall be amended to provide that Seller shall provide not less than fourteen (14) days prior written notice to Purchaser of a Closing Date, and that in no event shall the Closing Date be any later than October 31, 2008, except with Purchaser's written consent.

5. Paragraph 9 shall be amended to provide that the closing shall take place at the offices of Chicago Title Insurance Company.

*Agreed*

6. Add the following at the end of Paragraph 8: "Purchaser shall not be obligated to close unless the Unit is substantially complete. which the parties agree shall include completion and operating condition of the elevator.

*Agreed*

7. Add the following at the end of Paragraph 7(c): "Seller acknowledges its obligation under the Condominium Property Act, as Developer, to pay all assessments for all unsold units from and after the date of the sale of the first unit."

*Agreed*

8. Add the following at the end of Paragraph 9: "The parking space shall be insured by the Title Company as a limited common element."

*Agreed*

9. Paragraph 10(d) shall be modified to provide that Purchaser shall be permitted to be accompanied at the Punch List inspection by an inspector of his choosing, at Purchaser's sole cost and expense. The Punch List completion and correction period shall be sixty (60) days.

*Agreed*

10. The phrase "refuses or" shall be deleted from the second sentence of paragraph 11. At the end of that same sentence, the phrase "plus any other sums theretofore paid by Purchaser" shall be added.

*Agreed*

11. Add the following at the end of paragraph 11: "Notwithstanding the foregoing, if Purchaser is unable to attend the closing on the scheduled time and date as a result of a substantial hardship, including but not limited to severe illness, hospitalization, death in the family, or obligatory business travel. Purchaser shall have at least five (5) days after giving a notice thereof to Seller to reschedule the closing, and this will not be considered a default or breach of the Purchaser.

*Agreed*

12. The following shall be added to Paragraph 20: "Notice to Purchaser shall likewise be made to Purchaser's attorney, namely, Leo G. Aubel, Deutsch, Levy & Engel, 225 W. Washington Street, 17th Floor, Chicago, Illinois, 60606, (312) 853-8455, Fax: (312) 853-8465."

*Agreed*

13. Seller shall represent the following as of closing:

A. The Property shall constitute a fully improved lot and all water, sewer, gas, telephone hookups and connections (but not service), drainage and electrical facilities and all other utilities and public or quasi-public improvements on or adjacent to the Unit required by law or for the normal operation of the Unit will be installed and connected under valid permits, in good working order, adequate to serve the Unit and fully paid for through the date of Closing.

*Agreed K*

2

B.  The Unit has been built in accordance with all applicable covenants, zoning ordinances, building line requirements and building code requirements of any authority, governmental or otherwise, having jurisdiction over the work;

C.  There are no unpaid installments of any special tax or special assessment, and that Seller will disclose, at Closing, any notice received by Seller of any prospective special tax or special assessment.

D.  Seller is not be in receipt of any notice for zoning, environmental, building, fire, health code violations or other dwelling code violation at the subject premises from any governmental body and on information and belief shall represent that at the time of Closing there are none.

IN WITNESS WHEREOF, the parties have signed this Rider as of the 8th day of July, 2007.

FOR SELLER:                                    FOR PURCHASER:

*[signature]* for Seller
7/20/07

3

# EXHIBIT  E

Writer's Email Address:
aubel@dlec.com
Direct Phone Number:
(312) 853-8455
Direct Fax Number:
(312) 853-8465

October 29, 2007

**<u>VIA FACSIMILE:  312-873-4518</u>**
Marc A. Cervantes
Cervantes & Cioffi LLP
1101 W. Fulton Market
Suite 300
Chicago, Illinois  60607

      RE:    400 N. Orleans, Unit D, Chicago
              400 N. Orleans, LLC to Clark

Dear Mr. Cervantes:

Thank you for your time on the telephone today.  I understand from our conversation that the subject unit may be ready to close by January, 2008.  The estimated substantial completion date in the Condominium Purchase Agreement was September 28, 2007, and we had negotiated a "drop dead date" of October 31, 2007.  Unfortunately, I didn't realize that in one of the versions of the Attorney Modification Rider, that date was somehow changed to October 31, 2008.

That having been said, January, 2008 is not an acceptable closing date.  I understand that the replacement of an elevator sub-contractor is the primary reason for the delay in substantial completion.  However, from what we can see from the street (my client having been refused entry into the Unit), there has been virtually no construction activity in this Unit in months, and little effort in meeting the estimated substantial completion date.

It is not reasonable to expect my client to incur the extraordinary expense of maintaining temporary housing for four months. The delays explained to me are not among those enumerated in the Agreement as providing good cause for failing to reach substantial completion on a timely basis. Seller is therefore in breach of the Agreement, and we demand the immediate return of Purchaser's earnest money and any other deposits made by him.

Please contact me to make arrangements for appropriate releases and waivers.

Very truly yours,

LEO G. AUBEL

LGA/tap

# EXHIBIT  F

# Cervantes & Cioffi LLP

1101 W. Fulton Market, Suite 300 • Chicago, Illinois 60607 • Office: 312-421-0808 • Fax: 312-673-4518

November 5, 2007

**(VIA U.S. MAIL & FAX: 312.853.8465)**
Mr. Leo G. Aubel, Esq.
Deutsch, Levy & Engel, Chtd.
225 W. Washington Street, Suite 1700
Chicago, IL 60606

Re: 400 N. Orleans, Unit D, Chicago, IL (400 N. Orleans, LLC to Clark)

Dear Mr. Aubel:

My office is in receipt of your letter dated October 29, 2007, regarding the above-mentioned property.

Pursuant to my previous letter dated October 19, 2007, your office had drafted the Attorney Modification Rider inserting the October 31, 2008, language during the Attorney Modification Period. If you are insinuating that someone at my office had made any changes to that language, you are mistaken. In fact, upon review of your records, you will see that on July 20, 2007, my client agreed to your proposed Attorney Modification Rider provisions, as stated within the four corners of the document. Therefore, pursuant to the Rider your office drafted and my client agreed to, we have until October 31, 2008, to close this transaction.

However, as I had conveyed to you during our phone conversation, we expect to close this transaction in January of 2008. My office will provide the requisite Notice of Closing to your office at least fourteen days, if not more, prior to the actual closing date.

Additionally, in good faith, my client and his broker have entered the unit and took multiple pictures of the unit and requested extras. We have included a CD-Rom of these photographs, so that you may share them with your client. As you will see, the CD-Rom includes the following photographs: bath, bath 2, floor, kitchen cabinets, kitchen cabinets 2, kitchen, shower, and shower 2.

Furthermore, as stated above, my office will send prompt notice to your office when a Closing Date can be scheduled. In the meantime, please feel free to contact me directly if you have any questions or concerns.

Sincerely,

Marc A. Cervantes

Enc.
Cc: 400 N. Orleans LLC (847-562-9801)
　　Atland Realty (312-587-9401)

Email address: marc@cervanteslawfirm.com • Website: www.cervanteslawfirm.com

# EXHIBIT  G

EARL A. DEUTSCH
TERRY L. ENGEL
FRANK R. COHEN
JERRY I. RUDMAN
MICHAEL J. DEVINE
STUART BERKS
KENNETH W. FUNK
PHILLIP J. ZISOOK
DENNIS E. FRISBY
ALVIN J. HELFGOT
JOEL A. STEIN
BRIAN D. SAUCIER
JAMES E. O'HALLORAN
AARON B. ZARKOWSKY
LEO G. AUBEL
KAREN KAVANAGH MACK
JEFFREY E. SCHILLER
JEFFREY B. HORWITZ
DAVID J. BEN-DOV
LEE E. FARBMAN
MAUREEN C. DUFFY
HOLLACE C. MURPHY

LAW OFFICES

# DEUTSCH, LEVY & ENGEL

CHARTERED

SUITE 1700

225 WEST WASHINGTON STREET

CHICAGO, ILLINOIS 60606

———

(312) 346-1460

E-mail: lawyers@dlec.com
Website: www.dlec.com
FACSIMILE: (312) 346-1659

———

COUNSEL
PAUL M. LEVY
MARSHALL D. KROLICK

Writer's Email Address:
aubel@dlec.com
Direct Phone Number:
(312) 853-8455
Direct Fax Number:
(312) 853-8465

November 7, 2007

Bryan B. Clark
4222 W. Sevilla St.
Tampa, FL  33629

     RE:    Purchase of 400 N. Orleans, Unit D, Chicago

Dear Bryan:

     Per our conversation yesterday, I sought permission to file a lawsuit on your behalf against the developer of the referenced property on a no-fee basis.  That permission was not granted.  In lieu thereof, enclosed is a standard form of engagement memo that sets forth our scope of services, fees and cost reimbursement policy in connection with litigation matters.  I understand that you are represented by another law firm, and should you decide to file a lawsuit against the developer, you are of course free to retain any attorney for this purpose, and we would certainly assist him or her in any way we can.

     If you wish to retain us to represent you in connection with litigation against the developer, kindly review the terms of the attached engagement memo.  If they meet with your approval, please print, sign, and return same to my attention via any convenient method.  Thank you, and we look forward to continuing to work with you.

     Very truly yours,

     LEO G. AUBEL

LGA/tap
cc:  Elizabeth Ballis

## ENGAGEMENT MEMORANDUM

TO:        Bryan B. Clark

FROM:      Leo G. Aubel
                Deutsch, Levy & Engel, Chtd.

DATE:       November 7, 2007

RE:         Clark v. 400 N. Orleans, LLC
                Not in Suit

---

On behalf of Deutsch, Levy & Engel, thank you for considering engaging our firm for the purpose of representing you in connection with the referenced litigation. The proposed terms of our representation of you are as follows:

A.    <u>Retainer</u>

Because of your existing relationship as a client of this firm, we will not require that a retainer be paid. However, we would require that initial filing and service fees be pre-paid in the estimated amount of $500. Any prepayment not applied to initial filing and service fees would be applied to fees as defined below.

B.    <u>Monthly Billing</u>

For each month in which we provide services or incur costs on your behalf, you will receive an invoice which details and describes the time devoted and costs incurred. Other than initial filing and service costs, I anticipate that such costs would be small, and for the most part, we advance costs of less than $100, and then seek reimbursement from you on our next monthly billing. You are responsible for paying the fees and costs in our monthly billing, in full, upon receipt.

C.    <u>Definition of Fees</u>

Fees are defined as our time devoted to this matter (in increments of 1/10th hours) at the hourly rates of the attorneys who work on such matters. My present billing rate is $305 per hour. In addition, I may periodically ask an associate or paralegal in the firm to assist me. The associates' and the paralegals' time will be billed at their regular hourly rates. In no case will the rate charged by any of these persons exceed $200 per hour.

It is likely that this matter would be assigned to one of my partners in the firm for assistance prior to and at trial, if necessary. I will seek your approval before doing so if his or her hourly rate is higher than mine.

Mr. Clark
November 7, 2007
Page 2

If the firm's hourly rates are adjusted in the future, you would be responsible for the hourly rates at the time of billing (i.e., if, six months from now, the hourly rates increase by 5%, then your billing from that time forth will be at the new rates).

D.   Definition of Costs

Costs for which you are responsible include, but are not limited to: filing fees, third-party service providers, fees for computerized research, faxing, messenger and/or overnight courier costs, copy costs, cab fares, and long distance telephone calls. If we expect to incur costs in excess of $100 for any single item, we will consult with you before proceeding. We may also ask you to pay such cost items directly to the provider.

E.   Timely Payment

If any monthly bill is not paid within sixty (60) days of the date of the invoice, you agree that we will stop working on this matter, our services shall be terminated and we shall withdraw from representing you.

F.   Final Billing

Our entire outstanding bill would become due at such time as that matter reaches a conclusion, or at any time that our representation of you ends. Any credit balance existing on your account at that time would be refunded to you. In the event that the litigation is settled with settlement funds being otherwise payable to you, you authorize us to instruct the appropriate parties that settlement funds should be remitted to this firm, and to the extent that settlement funds are sufficient to pay our outstanding bill, that amount would be deducted from those settlement funds, and the balance would be remitted to you.

* * * *

I hope this memo does not appear overly formal. However, the firm has found that a clear understanding of financial arrangements with our clients is important at the outset. Once understood, we can then focus our attention on achieving the best possible results on your behalf.

If the terms of this letter meet with your approval, please sign and return a copy via any convenient method, which will serve as the Agreement between us. Of course, if you have any questions, please feel free to call me. We look forward to working with you.

**AGREED TO AND ACCEPTED this _____ day of _____, 2007.**

_____

**BRYAN B. CLARK**